In our federal system, each state is sovereign within its own territory, but no state has the right to regulate commercial activity beyond its own borders. Yet SB 17 does just that by freezing in place for 60 days a drug's wholesale acquisition cost, or WAC, that is its national list price. California's unprecedented decision to regulate wholesale prices required to be uniform under federal law gives SB 17 the same direct effect in every state. It also means that a violation can occur based on conduct outside of California, even in is the very definition of extraterritorial. Your Honors, I am prepared to discuss any aspect of today's case, but given our limited time together, and subject to the Court's direction, I would propose to focus on our primary submission that SB 17 is invalid under the Dormant Commerce Clause because it regulates wholesale prices required to be uniform under federal law. And I'm glad you started there. When you're giving your address to the Court, could you also talk about the injury that your clients have suffered in terms of standing? If you could just mention that a little bit. And why don't I just start there to get it out of the way? There is no dispute that the manufacturers who are pharma's members are subject to the requirements of SB 17. They are forced to comply with it. And in fact, they are forced, and we'll get into this, to change their behavior with respect to wholesale prices as a result. That is an injury in fact for purposes of Article 3. And has that actually happened yet? Or is that something they're anticipating will happen? That has happened. There is no dispute that pharma's members are complying with SB 17 under compulsion. Thank you. Our argument— Can I have you pick up on the point that you were starting with? Because this SB 17 doesn't really prohibit or regulate pricing. It's just a notice statute. So in that sense, it's a lot less direct than some of the other cases that the parties are relying on. So what I'm trying to figure out is whether there are factual disputes going to the question of whether pricing is in a freeze, as you argue. Can you explain your theory a little further to me? Sure. So our theory rests on three propositions. That first, to regulate list prices is to regulate commerce for purposes of the Dormant Commerce Clause. That second, because list prices under the WAC are required to be uniform nationwide, when you regulate the WAC, it means you are producing the same effect in all 50 states. And finally, that that effect is direct and not indirect. So I'd be happy to go through those three, and I think I'll answer your question. Well, there are price negotiations that happen, and I know that your argument is that by requiring this notice, it effectually changes the party's behavior, impacts price negotiations. Can you explain that a little bit further? Sure. So that is part of our argument about the practical effect of SB 17, but our primary submission is a legal one, that creating a list price is itself engaging in commerce in a way that the Dormant Commerce Clause implicates. And for that reason, if you force manufacturers to change the way that they do list prices, you are regulating interstate commerce. And Judge, when your decision in the San Francisco Foundation case, I think, provides the best articulation of this, because what you explained is that a state statute implicates the Dormant Commerce Clause if the activity it regulates could be regulated by Congress under its Commerce Clause authority. And there is no dispute that Congress can, and in fact, in many respects, does regulate list prices. We provide a few examples in our brief. We say, for instance, that there is a federal statute governing sticker prices for automobiles. The Federal Trade Commission regulates the deceptive use of suggested manufacturer prices, and the antitrust laws apply to collusion with respect to list prices. So Congress can, and in fact, has regulated those under its Commerce Clause authority. That is a regulation of commerce. Right. Right. No, I understand your national uniformity argument. I mean, this is not an easy case. But I'm trying to get specifically to the issues raised by the state and the state reserved, which essentially go to their argument that there are factual disputes here. But this is not the right time to figure that out. So setting aside the national uniformity argument for a moment, I'm just trying to understand, like, in what way does this impact price negotiations engaged by the state? Or Medicare reimbursement can take one of those issues, whichever is easier for you to explain this argument to me. I echo that. I just want to know from a pragmatic perspective, because the state argues that nothing they have done prevents the actual transactions from taking place. It's just they just don't, they want the notice to be given so that people can make judgments about, you know, where prices stand. So some kind of practical response to that would be helpful. Sure. And that argument and all of California's arguments about the facial nature of this is that the only thing that matters for dormant commerce clause purposes is whether there's an effect on the final transaction prices. If that argument fails, because even the listing of list prices is itself commercial activity, then there is a direct effect here, because there's no dispute that SB 17 regulates the WAC and the WAC is a list price. But why don't I just in a concrete way walk through how SB 17 works, because I think this will provide a good framework for our discussion. So SB 17 applies when any manufacturer sells into the state of California. A lot of those manufacturers are based in New Jersey. So why don't we use a New Jersey manufacturer as an example. And let's say that the manufacturer has a drug with a wholesale price of $100 for a course of treatment, and they want to increase that to $120. They provide notice today to California under SB 17. That starts the 60-day clock going. They are now frozen at a price of $100 until September 3rd. But let's say, nevertheless, the manufacturer says, I'm going to just go ahead and increase the wholesale price before that. They might do that, for instance, by submitting a higher price to federal officials under their quarterly reporting requirements, as they're required to do every quarter to HHS. So these are federal officials in the District of Columbia. Essentially, you just have the possibility that they decide to list a higher price with one of the private publications in which such prices appear. So the most prominent example is probably a publication called Metaspan, which is published by a private company in Pennsylvania. So now, based on those communications, all of which happened on the East Coast, we have a New Jersey manufacturer communicating a higher list price to federal officials in the District of Columbia or to a private company that is going to list the higher price in Pennsylvania. That manufacturer is now out of compliance with SB-17, despite the fact that all of those communications were perfectly lawful in the states in which they were made. And one other point on top of that, not only would they be out of compliance with SB-17 because they increased the WAC before the lock-in period was over, they would actually be out of compliance with the laws of the states of Oregon and Washington as well, because those states have I just gave you. So I don't think there's any clearer indication of the fact that you are regulating extraterritorially than you can violate the law of three states simultaneously based on conduct entirely outside of those states. And that's what I mean by the direct effect on commerce. The manufacturers have to report the WACs quarterly, like the average sales price? That's right. That's where the term wholesale acquisition cost actually comes from. Because keep in mind, this is a federally defined term that California has chosen to adopt. That is the key and unprecedented feature of this case. Apart from SB-17 and the two copycat statutes that I just mentioned, we're not aware of any other state that has attempted to regulate a feature of commerce that is required under federal law to be uniform. And this was not some accident. We're not relying on the legislative history for any legal proposition, but it was very clear if you look at the statements of SB-17's drafters that they understood and in fact intended to set health care policy for the entire nation. And there's a reason that this court's decisions have emphasized uniformity in cases like Rosenblatt, in cases like NCAA especially. And that's because when you regulate something that has to be uniform throughout the country, you are in essence forcing everyone to play by the rules of the enacting state. And I think that's very clear from NCAA, where if you recall the Nevada statute at issue there, it set certain disciplinary procedures that the NCAA had to use, but they only applied to proceedings involving a Nevada school or some employee or student of that school. Nevertheless, what this court explained is that because the NCAA as a functional matter had to apply the same set of rules to everyone throughout the country just to be fair, Nevada was essentially forcing the NCAA to use Nevada's rules everywhere throughout the country. Here, the requirement of uniformity is not just functional. It's not just functionally required to use the same WAC. It is legally required. There is no such thing as a California-specific WAC. And so when you regulate the WAC directly as SB 17 does, you are producing the same effect everywhere in the country. And keep in mind, if California can regulate a nationally uniform feature of commerce, every other state in the country can do so as well. To put it bluntly, anything California can do, another state, let's say Texas, can undo. If California can require advanced disclosures to changes in the WAC, then Texas could forbid them on the theory, for instance, that they lead to and you would end up with conduct being regulated under different states' laws simultaneously, possibly not conflicting, but possibly conflicting. And the manufacturers would simply still set the WAC that they want by giving the 60 days notice before the new WAC comes in. So if it's reported quarterly, then you just kind of work ahead of the game by giving the 60-day notice before the next WAC price kicks in. So this was the precise argument that was made by the dissent in Brown-Foreman. At issue there was a 30-day freeze for distillers that once they provided notice, there was essentially a 30-day lock-in. And the dissent said, well, distillers can deal with that by just changing their prices 30 days in advance. And the majority rejected that argument in part because this is not just a disclosure requirement. The advanced disclosure is what creates the lock-in effect, and you're forcing manufacturers to do something differently at a minimum to do 60 days in advance what they otherwise would have done 60 days later. You're changing their decision-making and their activity outside of the state. And I think that leads me to my final proposition, which is that the out-of-state effect of SB17 is not indirect. It is direct. We agree with the state of California that this is a key distinction in this court's Dormant Commerce Clause jurisprudence. And there is a pretty straightforward way to figure out whether a state statute regulates directly or indirectly, and that is to ask, can you become out of compliance with that state's law by engaging in conduct outside of the state? And that is very much true. I've given you the example of a New Jersey manufacturer who makes communications from New Jersey to the District of Columbia, federal officials there, or to private compendia who are publishing from Pennsylvania. And all of a sudden, they are out of compliance with California's law, with Washington's law, and with Oregon's law as well. So you can become—the out-of-state conduct is itself—it constitutes the violation. And contrast that with what this court has said about other cases where we were only dealing with indirect out-of-state regulation. The most recent example is the pork producers case. The law at issue there, Proposition 12, forbids the sale within California of pork that has certain prohibited characteristics. And the challengers to that law conceded that the only direct effects of that law are in-state. Nevertheless, they argued there are significant out-of-state effects, spillover effects, if you will, because there's just no practical way to create a separate production stream just for the California market. And so just as a matter of economics, they would be forced to adopt the California standard for their production nationwide. Here, by contrast, the effect out-of-state is not practical, and it's not economic. It is direct. It is the out-of-state conduct itself of increasing the whack through the communications on the East Coast that puts you out of compliance with the law. And more than that, it's not just that it's uneconomical or difficult to create a separate whack for California. Given the requirement of federal uniformity, it is mandatory. And then just to put the same point one more way, in the pork producer's case, there was nothing that you could do outside the state of California that would put you on the wrong side of Proposition 12. It was only the sale of meat within California itself, if it had certain prohibited characteristics, that would make you noncompliant. Here, by contrast, it is, in fact, out-of-state conduct that puts you in violation of SB 17. So, please. I did have a question for you on the second issue, but I don't want to interrupt your flow. Okay. Well, why don't I – I'm happy to move to the second issue. Just here's my quick question for you. Now, again, I'm not saying this is how I think about the case, but I just want to understand how the two issues fit together or don't fit together. So, as I understand your position, if we were to agree with you on the Dormant Commerce Clause, then under the whole 1292B and whether the First Amendment issue is really in this case or not in this case, from your perspective, do we have to rule on the second issue if we agree with you on the first? So, you don't have to. The grant of interlocutory review was just on the Dormant Commerce Clause. We do think that they are separate issues, and we think the First Amendment issue is before you, because a grant of interlocutory review brings up the whole case. We think it's an important legal issue. We think we've raised a substantial issue, and that deciding it would substantially advance the case. And it will still be there if the Dormant Commerce Clause is in effect, but there are separate provisions that are being challenged there. But if you, okay, that's my question. If you were to prevail on Issue 1, let's say you hit a home run on Issue 1, what is left to decide as to Issue 2 that would not be covered by Issue 1? So, there are two different parts of the law that are being challenged under those two constitutional provisions. The first part of the law is the advance notice requirement.  When they make increases in prices, disclose why that is and to justify them. And that is a separate provision. Got it. So, that applies regardless whether the advance notice requirement? It does. Our focus is certainly on the advance notice requirement, but it is a separate requirement. So, if we were to decide that the advance notice requirement does violate the Dormant Commerce Clause, we would still need to address the First Amendment issue. And your argument on that is? Sure. And just to be clear, we would very much like you to address it. I don't think in order to resolve this appeal, because it's interlocutory, you are required to do so, but you very much have discretion to. But you agree under Coopers v. Leibrand, it is up to us whether we take on the second issue. Absolutely. That's right. And our argument on that is pretty simple. It is that because there is no dispute that the forced disclosures by SB 17 are content-based and California does not claim that it can satisfy strict scrutiny, California only prevails if they can show you that they prevail under the Zouderer standard that they invoke. But Zouderer does not apply to forced disclosures about private decision-making. It's never been applied outside the context of disclosures for commercial speech to make sure that they're not deceptive or disclosures that are necessary to disclose certain health and safety features of products and services. And so, it would be a substantial extension of the doctrine to apply it to this sort of internal business decision-making. That's an issue here. So, what standard would we apply to that provision if we were to find that Zouderer doesn't apply? So, our assertion is that because it's a content-based restriction, strict scrutiny applies. If there are no further questions, I'll reserve for the rebuttal. All right. Thank you, Counsel. Ms. O'Grady. Your Honor, may it please the Court, Sharon O'Grady, Deputy Attorney General for the State of California. Excuse me, for Elizabeth Landsberg, Director of the California Department of Health. H. Chi. The sharp increases in drug prices in recent years has had a significant fiscal effect on California and constitutes a health and safety threat to California citizens who may have to choose between paying for drugs and paying for food and housing. SB 17 was enacted as a step toward addressing the problem by requiring drug makers to provide advanced notice before making significant increases, more than 16%, in the whack for their drugs. This was intended to allow California purchasers, including the state, which is the largest, to develop strategies for dealing with price spikes, including finding alternative formulations and negotiating further discounts. It's a facial challenge, which requires that PhRMA show that there is no set of circumstances under which the law could be valid, and the fact that the law could be unconstitutional under some hypothetical set of circumstances, not actually presented by any facts in this case, is not enough. The district court correctly held that PhRMA had not carried this burden on its motion for summary judgment and had not shown the extent of any effect of the law on interstate commerce. The purpose of the Dormant Commerce Clause, under the modern doctrine, is concerned about economic protectionism and laws intended to benefit interstate economic interests by burdening out-of-state competition, and the courts focus on the practical effect. Here, the law doesn't benefit local interests to the detriment of out-of-state interests. There's no conflict with the law of any other state, nor is there a conflict with the state's interests. All of those other states have to pay a reimbursement for their version of Medicaid, and all of them have citizens who suffer from high drug prices, and that's why there is no conflicting state legislation that PhRMA points to. There's also no conflict with any federal interest. There's no allegation of Medicare Act preemption or Medicaid Act preemption. The presumption against preemption, as the and force when it appears that the governments are pursuing a common interest and the federal government has not decided to the contrary, and that's exactly what we have here. The WACC is not a transaction price, and in contrast to Healy and Brown-Forman, which address transaction prices, they have not shown that mere advance notice of a list price that is concededly not the transaction price in almost every circumstance is a direct regulation of out-of-state commerce. The notices are required to be given to California purchasers for drugs sold in California, and I would note that in the Walsh case, with one or two This is not a price control case. This is a notice case, but that involved price controls imposed by the state of Maine, and the vast majority of all of those transactions were out-of-state transactions, but they ended up being purchased for use by Maine purchasers, and so that's what we have here. So, counsel, let me just jump in. I imagine in his rebuttal time he's going to say, because for 60 days, the price is locked in. What's your response to that? Our response is that we actually showed, through our expert testimony, that prices go up even when the WACC doesn't go up, and just because the WACC goes up, the prices don't go up in a commensurate amount. So they haven't shown that control of the—first of all, they haven't shown that these drug companies don't plan well in advance. We establish that increases sufficient to trigger the notice occur about once a year or less, once every three years. So they haven't shown that the drug manufacturers don't already plan like any business does for the future, but they also haven't shown that a, quote, freeze in the WACC translates to a freeze in the price. And to back up a little bit, the WACC is an industry—it is nationwide, and it's an industry standard. It's set by the drug companies. It's not, per se, regulated by the federal government, except in the rare instances that it can be used as a basis for reimbursement under Medicare and Medicaid, which I'm happy to talk about. So it doesn't have to be reported quarterly to the federal government unless it's being used as a basis for reimbursement, which goes to Judge Owen's question about standing. We actually objected that they had no—that they had not proved standing at all in the district court, but we did recognize that that was something they could cure. But they have been actually affected and unable to raise the price of one of their drugs because they—it happened to be a new drug in the first quarter that they decided to raise by 16 percent or more—more than 16 percent within months of having it be issued, or that it happened, and we actually established, I think, fairly significantly that the WACC otherwise was—it can sometimes be the basis for single-source drugs if it's lower than what is called the average sales price, but because WACC doesn't contain discounts and the ASP average sales price does, the only time WACC is going to be the lowest, even for single-source drugs, is in a situation where the WACC is going down. So they haven't shown that any of their members have actually been unable to do any of the horribles that they say. So we're really talking about a statute that has not necessarily completely insignificant, but certainly indirect effect on interstate commerce. And there is no law that—no case that they have cited to where a court has looked at a list price and said this is a per se, extraterritorial regulation, especially in a market like the drug industry where all of their real prices are super secret and can't be disclosed, and they have a complete freedom to set their WACC, and their transaction prices are not tied to their WACC. So expand—so we have an even-handed statute. It doesn't—it applies to anyone who sells in California, wherever they're located, doesn't discriminate against people across borders, its impact is indirect, and expanding the Dormant Commerce Clause to discover—to cover this kind of situation would discourage states from experimentation to further their own local interests, which this court found in Rocky Mountain Farmers Union v. Corey was not what the Dormant Commerce Clause was intended to address. It was intended to permit individual state experimentation that could either be adopted vertically by the federal government or horizontally by other states, as they pointed out in that case. I would also add that PhRMA suggests no alternative that would meet the case in a less restrictive way. The state has already found kind of the basic level of disclosure required. It's a list price that is a common benchmark. It allows people to make comparisons from one drug to another. So if Eli Lilly spikes the price of its insulin, maybe people will have time to find an alternative formulation. And if they believe that it has that impact that they are representing to this court, which is not supported by the record, on remand they can try to show that the burden of the statute outweighs the local benefits under Pike v. Bruce Church. But they haven't shown that their members have been anything other than inconvenienced by providing a written notice when they would rather not do so. I think I've covered the quarterly reports to the federal government. The whole Medicare Act is subtitled Use of Average Sale Price Payment Method, Not Use of the WAC. And they need not disclose the WAC at all unless they are using it as a basis for reimbursement, none of which their members have actually shown. I don't know that the court needs to reach the market participant doctrine, but the state is a major purchaser of prescription drugs. SB 17 has a severability clause, and the courts in the past have found that severable segments, and this court did in engine manufacturers versus South Coast Air Quality Management, so that at least as to the subsection that requires notice to California agency purchasers, we would argue that the market participant doctrine applies. We don't think you have to go there because we think that the entire notice provision is valid. And this is a little off topic, but it does help me kind of think through the severity of the problem that the plaintiffs are alleging here. When California purchases its prescription drugs, is it like a contract, one big contract that governs this with a particular manufacturer? How does it work? No. The California agencies pay for drugs in a number of ways. About a third of California citizens are Medicaid recipients, and states individually negotiate for reimbursement of CalPERS, which covers many California employees, has their own benefit plan. I'm a state employee, and we have some kind of a health insurance coverage, and I don't know all the details, but the prisoners are covered. There's a state agency that provides health care to prisoners in California. So there are a whole galaxy of state agencies who are individual purchasers or reimbursers, payers of drugs, and they are all pursuant to different plans. And the reason I ask is I was wondering why, instead of enacting SB 17, I mean, there are plenty of reasons to enact it, and I appreciate what the state's trying to do here. Is there California, you want us to buy your drugs, here's the deal. And to not make it a law that affects everyone, just the manufacturers that sell to people in the state of California. This isn't an issue that has come up, and so I probably don't have a complete answer for you. Fair enough. But I think that the problem is that all of these, you know, since their pricing is secret, and even under Medicaid, there has to be a structure that is approved by the Center for Medicaid and Medicare Services, and I think I have that right. I think that they would argue that even that, that would be even a more direct violation of the Dormant Commerce Clause, because the formulas that states use would be somewhat locked in. But I don't know the answer to that precisely. Sure. I believe that they would take the position that's one step closer to crossing the Dormant Commerce Clause line than we are, where we're at a list price that we have shown doesn't move in tandem, doesn't move with the WAC necessarily, doesn't move in tandem. But it is an important benchmark, and it is important information that helps the purchasers and providers to, you know, save health dollars and provide the best care they can to Californians. Do you agree that the WAC is the starting point for negotiations or not? So if you raise it or lower it, it would affect the end result? The WAC is the list price, and it is basically the starting point in the negotiation process. But it can be vastly different, and it doesn't have to be timed. You know, it isn't like if the WAC goes up today, your prices are going to go up today, or even maybe next year. All of that depends on a myriad of other factors that are negotiated, or in the case of ASP, based on historical data, for example. But yes, it is an initial starting point. But that doesn't have as much relevance to their national uniformity theory, and the argument that SB 17 directly impacts a national uniform requirement because the disclosure changes their decision-making process. How do you respond to that? Unlike NCAA versus Miller, where you had a law that actually only targeted interstate commerce, it only applied to the NCAA, which was an interstate, and the court there found that in that arena, there was a requirement for national uniformity. That isn't the case in the prescription drug industry. I mean, if it had, the Pharma versus Walsh case would have come out differently, and Maine wouldn't have been able to do what it did in that case. The drug industry is very fragmented, and even the difference that you pay going to CVS versus Walgreens can be vastly different. So the drug industry itself doesn't have a uniform pricing policy. It's vastly different depending on where you are in the country and how big the purchaser is and what their bargaining power is and a myriad of other factors. Do you want to address the First Amendment argument? Yes. I would first note that the district court found that Pharma hadn't carried this level of scrutiny, including strict scrutiny. But I think it is plain that Zotter applies. This is commercial speech. It has to be communicated to buyers and payors of prescription drugs. Therefore, it is related to a sales transaction of a product. It's factual and non-controversial. They're required to state whether the change is necessitated by change or improvement in a drug. That's completely factual. The FDA has to pass on any changes to drugs, even inert ingredients, even labeling. So that is not an arbitrary benchmark. Is improvement defined somewhere? No. But since the FDA has to pass on anything that is an improvement. And the drug companies decide whether they believe that what they've done is an improvement or change. We're not telling them what to do. And I do want to point out that they've made it. It only came up in their reply brief, so we couldn't address it. But they argued that somehow HCI could require them to change their notification if they didn't like the content. And they pointed to a provision in a different section, which is 12-127-679, which relates to quarterly reporting that drug companies do of basically publicly available companies' information to the agency. And the agency does have authority to enforce that section. It's very explicit, it's that section. But HCI doesn't actually enforce or even receive the notices that are given to purchasers. It's not a purchaser. So it doesn't receive the notices. And it certainly doesn't vet, pass, review, or reject them. And they haven't presented any evidence that any of their members have actually been affected by that requirement, you know, because of state interference. And, in fact, we pointed out that the drug companies do, are free to, and do include whatever other explanation they want to add to their notice. And we quoted some in our briefs where they're quite self-serving, and that's fine. As long as they contain the required disclosure, they can, you know, provide any other explanations they want for their more than 16% increase in the price of their drugs. There's nothing to prevent them from doing that. And that isn't something that my client has, you know, oversight over. And, you know, it's really left to them to make the decision of what the disclosure should be based on their knowledge of their drugs. And, you know, as I noted, the WAC itself is publicly available, as is improvements made by the FDA. But it's not, but neither of those is really readily accessible, which is why it's important that the drug manufacturers provide the information. WAC is published, it's not published by the federal government. It's not published by states. It's provided by expensive subscriptions. And, you know, and it changes. So someone who is a purchaser trying to bird dog every change that the drug companies are making to their drugs would be hard pressed to try to do that. The FDA does include on their website changes and improvements in the drug. But the person in the best position to make those disclosures is the manufacturer who has to disclose it to their own shareholders, for one thing. And they, you know, are in the best position to do that. That provides some transparency in an industry that is very non-transparent. And the information imbalance that occurs in the prescription drug industry is not beneficial to the public, is not beneficial to the state of California, isn't beneficial to the nation. This is a small step, perhaps imperfect, but it's the best, you know, it's the best that the state has been able to come up with under the circumstances. And even that modest step, the modest advance notice only, non-price control, has been met with, you know, fierce opposition. I would note that there's a severability provision, and even if the court was troubled by the advance notice, notice could still be required. There are a lot of, they've only targeted very small pieces of the statute. We think it is all completely consistent with the Dormant Commerce Clause. No one questions that skyrocketing drug prices are a real threat. California has a significant, even a compelling interest in addressing the problem by creating transparency. As this court held in, you know, Rocky Mountain Farmers Union, experimentation by states can be very important in dealing with these really important health and safety issues. And we think that, we believe that the court should affirm the district court's ruling, remand it back to the district court, and let PhRMA and its members, you know, try to establish, if they can, what the exact burden is and how that balances against the state's obviously significant interest. All right. Thank you, counsel. Thank you, Your Honor. Mr. Keeton. Thank you, Your Honor. Let's start with standing. PhRMA's members are subject to this law and they are complying with this law, even though they believe the law is unconstitutional. I don't know of any authority for the proposition that a regulated party who is complying under compulsion with a law they believe to be unconstitutional lacks standing to challenge it. You heard my friend from the state many times say, this is not a price control. It does not affect prices. But what she really meant is, it doesn't affect final transaction prices. But that argument only works if you don't consider regulation of list prices to be within the ambit of the Dormant Commerce Clause, because SB-17 does regulate the WAC and the WAC is a list price. So, too, her argument that drug prices are not uniform. Final transaction prices may not be uniform, but the WAC is, by definition, uniform, and the WAC is what SB-17 directly regulates. And it has the same direct effect in every state because of that national uniformity. My friend pointed out that there's no direct conflict with the law of another state, but that's not required under the Dormant Commerce Clause. You didn't have a conflict in Daniel Sharpsmart, in the NCAA case, in the San Francisco Foundation case. And the reason is because it is simply beyond the enacting state's authority to try and regulate conduct beyond its own borders, irrespective of whether its law conflicts with the law of another state. But you could, in theory, have one if Texas, for instance, forbids advance notice of the WAC. My friend pointed out that this is a facial challenge, and that is correct, because we are relying on the evident effect of this law based on the text of the statute. But the rule against extraterritorial regulation is per se, which is why so many of these cases, including San Francisco Foundation and Brown Foreman, are raised on facial challenges. Quickly to my friend's severability point. There is no way to sever off the portion that regulates just for state purchasers because there is no WAC specific to California. There is no WAC specific to state purchasers. So when you freeze the WAC, you are freezing it for everyone. My friend said that this is something that the state of California is forced to do. There are many other states that have enacted regulations that apply solely to transactions within the state that apply to limits on the amount that the state is willing to pay for drugs or there are limits on the amount that they're willing to reimburse. Or for private party transactions, they impose rebate mandates. Those don't violate the Dormant Commerce Clause, although they may have other problems. Finally, why does all of this matter? The Dormant Commerce Clause goes to the heart of our Constitution. Our nation throughout its history has had many periods of great stress on our federal system because of differences of public policy between states. The Dormant Commerce Clause, by keeping states within their proper sphere, helps to avoid and minimize those conflicts, and that is as important a function now as it ever was. If there are no further questions. Okay. Well, thank you, counsel. Pharmaceutical Research and Manufacturers of America v. Landsberg is submitted, and this session of the court is adjourned for today. Thank you very much for a very good argument. All rise.
judges: WARDLAW, NGUYEN, OWENS